[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This matter is properly before the Court on plaintiffs' petition for the assessment of damages pursuant to Rhode IslandGeneral Laws 1956 (1984 Reenactment) § 37-6-18. The subject parcel of real estate, Black Point, is owned by Ocean Road Partners ("plaintiffs"). The State of Rhode Island ("State") took title to plaintiffs' land by condemnation on July 7, 1989. The condemnation procedures employed by the State complied in all respects with the applicable statutory law.
The parties filed a joint stipulation of facts which, in chronological order, follows. Black Point consists of approximately 44.6 acres of oceanfront land on the southeasterly side of Ocean Road in Narragansett, Rhode Island and is identified as Lots 529-535 and 541 on Assessor's Plat T. Plaintiffs purchased the property on November 9, 1984 with plans to construct thereon an 80-unit condominium development.
The zoning history of Black Point and the Town of Narragansett ("the Town") was included in the stipulation of facts. The Town enacted Chapter 246, entitled "Town of Narragansett Zoning Ordinance", of the Ordinances of the Town of Narragansett on March 6, 1974. On May 8, 1978, the Town amended Chapter 246 by enacting Chapter 367, which added Section 13B, "Residential Cluster Developments". The Town then amended Chapter 246 on May 11, 1981 by enacting Chapter 454, which modified the density requirements for multi-family units.[1] Chapter 506 was enacted on February 20, 1984 by the Town amending Chapter 246 by adding an R-80 Residence District and modifying Section 13 ("Special Exception for Multi-family Dwellings") and Section 13B to incorporate the R-80 Residence District. On July 1, 1985 the Town re-zoned the property from an R-40 to an R-10 Residence District, with certain conditions and restrictions, through the enactment of Chapter 533.
The Division of Land Resources of the Department of Environmental Management ("DEM") determined, on August 30, 1985, that there were freshwater wetlands adjacent to the property. DEM later determined, on April 28, 1987, that the application by the plaintiffs to construct the condominium complex, roadways, and site drainage would not violate the water quality content for the area.
The Director of Public Works of the Town determined, as of December 3, 1985, the plaintiffs' proportionate share of the cost of upgrading the Burnside Avenue Pumping Station and of replacing the sanitary sewer line along Ocean Road to enable the municipal sewer system to handle the proposed development. The cost was estimated to be between $479,205 and $601,622.
On December 11, 1985, the plaintiffs filed an amended application for a special exception for construction of the condominium development with the Narragansett Zoning and Platting Board of Review ("Zoning Board"). During the pendency of plaintiffs' application, the Town amended Chapter 246 by enacting Chapter 540, which changed the unit lot area requirements for special exceptions for multi-family dwellings. The Zoning Board entered its decision on July 31, 1986, approving the plaintiffs' amended application for the special exception but with certain conditions, which conditions plaintiffs appealed.
On September 22, 1986, a justice of the Superior Court granted plaintiffs' motion for a stay on the imposition of conditions 1, 3, 4, and 15 of the special exception, pending final judgment of the zoning appeal. The Court further ordered the Zoning Board to authorize and direct the issuance of a building permit to the plaintiffs upon their compliance with all conditions, except 1, 3, 4, and 15, of the special exception. A decision and judgment, respectively, was entered by the Court on April 7 and May 8, 1987 on the plaintiffs' appeal of the July 31, 1986 decision of the Zoning Board. On November 10, 1987 the Rhode Island Supreme Court denied the Zoning Board's petition for a writ of certiorari with respect to the May 8, 1987 judgment.
Chapter 246 was amended several times during the pendency of the appeal. On March 16, 1987 Chapter 570, which modified the density requirements for special exceptions for multi-family dwellings, was enacted. Chapter 573, which incorporated public shoreline access provisions for special exceptions for multi-family dwellings and residential cluster developments, was subsequently enacted on April 6, 1987.
On November 26, 1987, the Town enacted a comprehensive amendment of Chapter 246, entitled "Town of Narragansett Amended Zoning Ordinance". On March 21, 1988 and May 2, 1988 Chapters 589 and 591 were enacted, both modifying certain supplementary zoning regulations and development standards for residential cluster developments.
After extensive hearings, the Coastal Resources Management Council ("CRMC") entered a final decision on May 22, 1989 relative to the existence of a public right-of-way on the property. On that same day, the CRMC entered a final decision approving, with certain restrictions, the plaintiffs' application to construct the 80-unit condominium complex on the property.
The parties have further stipulated that Black Point contained a prehistoric archaeological site and, as a prerequisite to the proposed development, the plaintiffs agreed to pay for certain archaeological work at an estimated cost of $61,737. The proposal for this work was entitled "A Final Recovery Plan: Protecting Archaeological Resources" ("Recovery Plan") and was prepared by the Public Archaeology Program at Rhode Island College.
On July 7, 1989, the DEM, acting on behalf of the State, filed a statement of condemnation, including a description and plat of the property, with the Narragansett Town Clerk and also made a final offer to purchase the property for $6,448,000. The plaintiffs, by letter dated July 11, 1989, rejected the DEM offer. Pursuant to Rhode Island General Laws 1956 (1984 Reenactment) § 37-6-17 and § 37-6-18, the plaintiffs thereafter elected to receive the DEM offer price of $6,448,000 and file a petition for assessment of damages with this Court.
The DEM has paid the plaintiffs the following amounts on the following dates:
 July 14, 1989: $5,348,000
 September 12, 1989: $ 100,000 plus $1,300 in interest
 January 4, 1990: $1,000,000 plus $37,733.04 in interest

As of the date of condemnation, the Town had approved a final written agreement that plaintiffs would pay their proportionate share of upgrading the Burnside Avenue Pumping Station. Also, the Historical Preservation Society and the CRMC had approved the Recovery Plan for the preservation of archaeological data. No further approval was required from the Historical Preservation Society, DEM, CRMC or the Town to proceed with the proposed development.
The parties agree and stipulate that the condemnation of Black Point on July 7, 1989 by the DEM is valid and that vested title in the land is with the State of Rhode Island.
The only issue presented to this Court is the amount of compensation the plaintiffs are entitled to receive as a result of the July 7, 1989 taking by the DEM and the State.
The law is well settled in Rhode Island that the measure of damages a property owner is entitled to receive as compensation due to a taking by eminent domain is the fair market value of the property. J.W.A. Realty, Inc. v. City of Cranston,121 R.I. 374, 380, 399 A.2d 479, 482 (1979); Travellers BuildingAssociation, Inc. v. Providence Redevelopment Agency,106 R.I. 83, 89, 256 A.2d 5, 8 (1969). The fair market value of the property is to be assessed at the time of the actual taking.L'Etoile v. Director of Public Works, 89 R.I. 394, 153 A.2d 173
(1959).
The best evidence of fair market value is prices paid on the open market at or about the time of the taking for substantially similar and comparable properties, when available and when proper adjustments can be made for minor differences between the properties. J.W.A. Realty, 121 R.I. at 380, 399 A.2d at 482;Thomas B. Gray, Inc. v. Providence Redevelopment Agency,114 R.I. 370, 376, 333 A.2d 143, 145 (1975). Significant factors that affect the comparability of other properties include location and character of the property, proximity in time of the comparable sales, and the use to which the property is put. Warwick MusicalTheatre, Inc. v. State, 525 A.2d 905, 910 (R.I. 1987); Corradov. Providence Redevelopment Agency, 370 A.2d 226, 230, cert.denied, 434 U.S. 807 (1977).
In determining fair market value, consideration must be given to the highest and best use to which the property may be put.Sweet v. Murphy, 473 A.2d 758, 761 (R.I. 1984). "Highest and best use" is that use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in the highest land value. 7 Nichols, Law of Eminent Domain, § 4.04[4]. Consequently, the amount paid to the owner is not dependent upon the uses to which the land was actually put, but rather to the use for which it is suitable. Sweet, 473 A.2d at 761.
The Court, sitting without a jury, heard testimony and received evidence on the issue of the fair market value of the Black Point property. The plaintiffs presented several witnesses in support of their case. These witnesses Richard P. Baccari, President of Downing Corp. ("Downing"); Richard Fleischner, a landscape architect; Laura Staines, architect and planner with the Martin Organization; Matthew Mahoney, Vice-President of Finance for Downing; and Raymond Lavey, Senior Vice-President of Downing's Residential Division — testified to the preliminary matters in acquiring the property and the research and analysis undertaken in developing the Breakers condominium concept ("Breakers"). The testimony offered by those witnesses itemized the expenditures of time and money made by Downing in developing this project from the conceptual stage to a fully feasible and buildable reality. Although some of the testimony was informative, some — namely that of Mr. Fleischner — shed little or no light on the issue at bar: the fair market value of the property on the date of condemnation.
The key testimony for the plaintiffs was offered by real estate expert William Coyle, Jr. who was engaged in 1984 by the plaintiff to appraise the Black Point property. He testified that the "highest and best" use for the property was for an 80-unit condominium complex. In calculating a fair market value he utilized the market data approach by comparing various parcels of land sold and the Black Point parcel. Mr. Coyle made two comparisons, one for the value of the land, and the other for the value of the condominium units. In determining the fair market value of the property, Mr. Coyle made comparisons with five parcels, valuations of which included the necessary upward and/or downward adjustments for character, use, zoning, size, and location. As a result of these comparisons, Mr. Coyle assessed the fair market value of Black Point to be $15,500,000.[2] The second comparison, involving the sales of eight high priced condominiums, and again including the necessary adjustments, enabled Mr. Coyle to conclude that the prices at which the Breakers condominium units were to be offered would have been in the range of those of other condominiums selling at that time.
On cross-examination, Mr. Coyle was glib yet evasive, Nevertheless, the answers elicited relating to his acquiring the costs and plans from Mr. Lavey and his failure to review the Downing marketing data detracted little, if at all, from his testimony. Even though the properties Mr. Coyle used as comparisons were in the commercial market in Newport, this Court finds that adjustments made to the properties allowed for an accurate reflection in the fair market value of Black Point.
The defendants presented two witnesses in support of their appraisal of the Black Point land. Thomas McLaughlin, a real estate appraiser and expert witness, testified that a State purchasing agent had asked him to appraise the property in the fall of 1988. Mr. McLaughlin stated that the highest and best use of the property would be to subdivide it into sixteen lots, each spanning the width of the land from Ocean Road to the ocean itself, and to construct one single family home on each lot. He testified that since the condominium market was "cold" and sales as well as prices for condominiums were falling, use of the land for a condominium complex would not be the highest and best use.
In determining the fair market value, Mr. McLaughlin also employed the market data approach. He used three comparable properties and made adjustments for time of sale and location. Giving the greatest weight to the third comparable, Aquidnick Court in Jamestown, Mr. McLaughlin testified that the fair market value of the Black Point property was $6,488,000.[3]
Although Mr. McLaughlin initially claimed to have arrived at his opinion prior to the condemnation, he conceded on cross-examination at having used data for his market trend analysis that was not available until May 1990; therefore, his trend analysis could not be accurate as of July 1989. Furthermore, to formulate his opinion he used financial data and MLS sources which only make up approximately 60% of actual sales in the state. It was also brought to light that although he had discounted the condemned parcel 10% for sales and marketing, he had not done so for the comparables he used. Mr. McLaughlin further conceded that ordinarily wholesale land should be discounted further, but he did not do that in this case.
On cross-examination, Mr. McLaughlin stated that although he determined the highest and best use of the property to be for single family home lot subdivisions, use as a condominium complex was not unforeseeable. He also recognized that property with more dense zoning, such as Black Point, is usually a more valuable property than one without but made no adjustments for that factor. Mr. McLaughlin acknowledged that he failed to investigate any offers to buy or sell made to Mr. Baccari or Downing even though it was his understanding that he was obligated to do so. Such offers, admitted Mr. McLaughlin, could be important in a fair market value assessment if such offers were bona fide.
In assessing the fair market value, this Court does not accept Mr. McLaughlin's valuation on the subdivision of single family lots for Black Point. Mr. McLaughlin would like this Court to believe that each separate lots, ranging in size from 1.7 acres to 4.2 acres, would sell for the exact same price. However, this Court believes it would be highly improbable for a purchaser to pay the same price for a smaller tract of land as that of a larger tract in virtually the same location. Mr. McLaughlin's testimony is here flawed. Accordingly, this Court finds said testimony to be neither credible nor convincing.
The Court also heard evidence from Mark Bates, a real estate appraiser with Schaeffer-Bates, Inc. It is clear that the testimony of Mr. Bates was offered to substantiate the fair market value assessment provided by Mr. McLaughlin. Unfortunately for the defendants, Mr. Bates' testimony did just the opposite. Mr. Bates' insistence that his testimony was an "opinion of value" and not an appraisal was not persuasive. He declined to give an appraisal but managed, in his "opinion of value", to agree with the numbers provided by Mr. McLaughlin.
It was demonstrated that Mr. Bates did not conduct a highest and best use analysis, an integral part of any fair market value assessment. He also neglected to review any of Downing's building plans, yet somehow managed to express an opinion of value strikingly similar to that of Mr. McLaughlin. Mr. Bates' credibility was further undermined when at one point of his testimony he stated an oral opinion was not an appraisal but at another point stated that an oral opinion or an oral report is the same as an oral appraisal. This Court finds Mr. Bates' opinion of value to be unclear, unconvincing, and unsubstantiated.
After considering the reliable testimony given by Mr. Coyle and Mr. McLaughlin's own admissions that property which is zoned for a higher density of population is worth more than property without same, this Court finds that the highest and best use at the time of the taking was for an 80-unit condominium complex. Mr. McLaughlin testified that the condominium market was "cold" in July 1989. However, it was later shown that even though in retrospect this analysis may have been correct, the data utilized was obtained after the date of condemnation, thus rendering it useless. This Court cannot accept analysis done in retrospect. The flawed testimony preferred by the defendants failed to substantiate their assessment of fair market value, leaving only the credible testimony of the plaintiffs' expert, Mr. Coyle. Furthermore, the defendants have presented no probative evidence that would enable this Court to reject or reduce the fair market value assessment provided by Mr. Coyle. Particularly, no evidence was presented to support the contention that the presence of the public right of way would lower the fair market value.
For the reasons set forth above, the testimony of Mr. McLaughlin and Mr. Bates is rejected. The persuasive and credible testimony of Mr. Coyle was neither successfully rebutted nor diminished by the defendants. Therefore, as this Court believes there may not be another piece of land quite like Black Point and further recognizes that each piece of land is unique, it finds that the comparables, with the adjustments made by Mr. Coyle, do provide the best indicia of fair market value valuation in this case.
Accordingly, based on all the competent evidence before it, this Court awards the plaintiffs $15,500,000 in damages resulting from the July 7, 1989 taking by the DEM and the State.
[1] Multi-family units include apartments condominiums, and townhouses.
[2] 44.6 acres x 43,560 sq. ft. x $8/sq. ft. = $15,542,208 = $15,500,000 (R).
[3]
$450,000/lot x 16 lots = $7,200,000 -32,000 Deduction for development ($2,000/lot x 16 lots) -720,000 Deduction for marketing sales __________ $6,448,000 + 40,000 adjustment upward after __________ condemnation $6,488,000